## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BILLY EARL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 8279 |
| | ) | |
| JEWEL FOOD STORES, INC., and | ) | |
| HIGHWAY DRIVERS, DOCKMEN, | ) | |
| SPOTTERS, RAMPMEN, MEAT | ) | |
| PACKING HOUSE, AND ALLIED | ) | |
| PRODUCTS DRIVERS AND HELPERS, | ) | |
| OFFICE WORKS AND | ) | |
| MISCELLANEOUS EMPLOYEES | ) | |
| LOCAL UNION NO. 710, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Jewel Food Stores, Inc.'s ("Jewel") Motion for Summary Judgment and Motion to Strike and Deem Admitted. For the following reasons, the Court grants-in-part and denies-in-part the Motion for Summary Judgment and denies as moot the Motion to Strike and Deem Admitted.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

Jewel is a grocery retailer with a warehouse in Melrose Park, Illinois (the "Warehouse"). Plaintiff Billy Earl was employed by Jewel from September 1988 to July 7, 2017, and most recently worked in the Maintenance and Sanitation Department at the Warehouse. Earl is over 59 years old.

The International Brotherhood of Teamsters Local 710 (the "Union") is a labor organization that represents the hourly warehouse workers at the Warehouse. The terms and conditions of Earl's employment was governed by a collective bargaining agreement (the "CBA") to which Jewel and the Union are parties. Earl had a copy of, and many opportunities to read, the CBA. The CBA includes an Attendance Policy which states as follows:

> No Calls:
>
> Employees not reporting for the scheduled, mandatory or voluntary work shift are required to notify management by the start of the scheduled shift. If notification is not given within the first four (4) hours of the shift, the employee is considered a no call/no show, except for a documented emergency.
>
> A no call/no show incident shall result in discipline. The first no call/no show shall result in a written warning. The second no call/no show within twelve (12) months shall result in termination.

Dkt. # 175, ¶ 8.

Jewel's consistent practice has been to terminate employees, including white employees, who have two no call/no shows within twelve months, as required by the

CBA. In addition to being in violation of the CBA, Jewel views it as "unacceptable" for employees to have no call/no shows on scheduled shifts because Jewel requires scheduled employees to perform their jobs.

On July 5, 2016, Earl was a "no call/no show" for work, for which Earl admits he was at fault. He was warned that a second no call/no show incident within the next 12 months would result in his termination.

Jewel employees use a standard form to select vacation and personal holiday days when requesting to take time off. When a vacation week includes a paid holiday, an employee has the option to choose an extra day off or an extra day of pay. It is the employee's responsibility to indicate if they want an extra day, to state what extra day they are electing, and if none is indicated, they will not receive an extra day off and instead will receive extra pay.

Earl submitted a vacation request form on February 2, 2017, identifying the days he would like to take vacation. This included the week of Monday May 29, 2017, to Friday June 2, 2017. That form did not have "June 5, 2017" written or printed anywhere on it. Earl's supervisor, Bill Knedler, was responsible for approving or denying vacation requests, including Earl's. On February 6, 2017, Knedler signed Earl's vacation form and approved some of the requested dates, including the week of May 29 to June 2, 2017, and denied others.

The parties dispute the circumstances surrounding this form and Earl's submission of it. Earl claims that when he submitted his vacation request form, he

wrote the words "Ex. Day" next to the requested week of May 29 to June 2, to indicate that he wanted to take the following workday off, which would have been June 5. Jewel claims that the form Earl actually submitted did not have "Ex. Day" written on it, and that he later wrote that in and asserted that it had been there when he submitted it, thereby "falsifying" the document.

Earl's regular schedule required him to work on Mondays. On Monday June 5, 2017 (11 months after his no call/no show on July 5, 2016), Earl did not show up for work. Per the above dispute regarding Earl's vacation form, Jewel contends that Earl was scheduled to work on June 5, 2017, that he did not notify Jewel management that he would be absent from work that day, and that his failure to show up constituted a "no call/no show." Earl agrees that Jewel deemed his absence to be a "no call/no show" but asserts that he successfully requested June 5, 2017 off and therefore was not required to be at work that day. Earl claims that Knedler approved Earl's request to take an "extra vacation" because the week ending in Friday, June 2 included the Memorial Day holiday.

Earl was discharged effective July 7, 2017. The Union then filed a grievance alleging that Earl's suspension and ultimate termination violated the terms of the CBA because Jewel lacked the requisite "just cause" for discharge. Jewel and the Union participated in a hearing to resolve the grievance on July 13, 2018. Laurence Goodman represented the Union at Earl's grievance arbitration hearing. Goodman testified that Jewel's "general position was they recognize people make mistakes" and that if Earl

"had basically acknowledged that he had the second no-call, no-show that they likely would have brought him back to work and . . . probably without backpay because that's typically the settlement that happens in cases with discharged employees." Dkt. # 175, ¶ 55. Mr. Goodman testified that it was his "understanding" that Earl was not interested in a settlement of his grievance for reinstatement without backpay.

At the grievance arbitration hearing, in response to the question "[d]idn't you make an allegation that you were discriminated against because of your race?" Earl stated that "[i]t wasn't supposed to be race. It's supposed to have been sex and age, but it looks like right now she put race down there. I get along with everybody in the company, so that race ain't never been a problem with me." *Id*., ¶ 57. When asked about this testimony at his deposition in this case, Earl stated that the testimony was accurate and honest when he testified under oath in the arbitration. Earl claims that this testimony "was not intended to mean that Jewel did not discriminate against me, but only that I had never discriminated against anyone at Jewel during my employment, and that I did not have racial problems with my co-workers other than those in management. If I had been given an opportunity to clarify my testimony, I would have reaffirmed my belief that my employment was terminated in part because of my race, Black." Dkt. # 183-2, ¶ 13.

By decision dated September 26, 2018, Arbitrator Brian Clauss upheld Earl's dismissal for violating the CBA's attendance policy. In finding that Jewel proved just cause to dismiss Earl, the arbitrator found that the true and accurate copy of his vacation

request form was the one that was in Knedler's office (which did not have "Ex. Day" written in) that Jewel presented at the arbitration hearing. This finding was based on the arbitrator's determination that "[t]here is no credible explanation in the record for [Earl's] document indicating an approved vacation leave that included a holiday day."

After losing his arbitration, Earl contacted the EEOC in an effort to get his job back. The EEOC notes indicate that Earl informed the EEOC that he was terminated for a no call/no show but that he "states he had the day off" and that "he doesn't know why he put race" and that he thought it could be "age first, not race, because he thought he was an 'old man.'"

> When asked why he believes he was discriminated against, Earl testified:
>
> My being a black man, I could tell -- I can say I was the only one in the sanitation department making top pay, and they had two cameras in there watching me every day and peoples walking in on me every day, you know. . . . I was top paid in the sanitation department. So whatever key rate people got in the warehouse, that's the same pay that I got. I got a raise. Other peoples [*sic*] in my department would only get a percentage of that rate. . . . [t]hey could replace two people with my job.

Dkt. # 175, ¶ 64.

Earl testified that he and Knedler "got along real nice" until the events leading up to his termination.

Beyond the grievance arbitration procedure and the EEOC charge, Earl also attempted to seek reemployment with Jewel through a handwritten letter that he composed with his attorney at his attorney's office. The parties dispute when the letter was written. Jewel points to Earl's deposition testimony stating that he wrote the letter

6

sometime after the pandemic started, *i.e.*, after March 17, 2020. Earl now contends that he wrote the letter sometime around July 2019. The parties also dispute whether and when the letter was sent to Jewel. Jewel points to Earl's testimony that he did not personally mail the letter, he did not see anyone mail it or otherwise transmit it, he does not know what happened to the letter after he wrote it, and he did not follow up on the letter or "submit any sort of actual employment application." Earl disputes this testimony with what appears to be a UPS tracking history, confirming delivery of an item in Melrose Park, IL on July 11, 2019.[1] Other than this letter, Earl did nothing to contact Jewel to seek reemployment. The body of the letter states:

> To Whom It May Concern
>
> As you know I was wrongfully [terminated]. I would like to apply for my job back. Please treat this letter as my application and let me know if you need any additional information.
>
> Billy Earl

Dkt. # 158-4, at 42.

As of his May 2021 deposition, Earl had lived at 1606 North Lockwood, Chicago, IL 60639 for thirty years. Earl's son, who turned 18 on February 19, 2017, lived with Earl at that address in 2017. His son would occasionally get the mail out of the mailbox when he lived with Earl.

---

[1] It is not clear that this tracking history refers to Earl's letter to Jewel. The corresponding tracking number appears on a separate letter that Earl wrote to the Union. *See* Dkt. # 169-5.

Jewel claims that it mailed Earl a detailed 18-page letter informing him of his right to elect to continue his healthcare coverage, pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), at 1606 North Lockwood, Chicago IL 60639 on September 7, 2017 (the "COBRA Notice"). The COBRA Notice, dated September 7, 2017, stated:

> IMPORTANT – To elect continuation coverage, you MUST complete the enclosed 'COBRA Continuation Enrollment Form' and return it to us. You may mail it to the address shown on the COBRA Continuation Enrollment Form. The completed COBRA Continuation Enrollment Form must be post-marked by 11/06/2017.

Dkt. # 175, ¶ 47. The COBRA Notice further provided that the "carriers will be notified to retroactively reinstate coverage once PayFlex receives both the COBRA Continuation Enrol[l]ment Form and the premium payment." *Id*., ¶ 48.

Earl never received the COBRA Notice. As evidence that it was mailed, Jewel cites the COBRA Notice itself, as well as a Certificate of Mailing Qualifying Event Notice (the "Certificate of Mailing"). The COBRA Notice is dated September 7, 2017 and is addressed to Earl at his 1606 Lockwood address. Dkt. # 158-4, at 2. The Certificate of Mailing is a two-page document. *Id*. at 37–38. The first page is reproduced below:



*Id*. at 37.  The second page is largely redacted, except for the line listing (under the heading "126794 - New Albertson's, Inc.") that Earl was the participant, his address was 1606 Lockwood, and that the document type was "QualifyingEventLetter."  *Id*. at 38.

Earl does not dispute the contents of the COBRA Notice document that Jewel cites but argues that the evidence does not show it was mailed, for example because there is no indication that it was placed in an envelope, addressed to Earl, with proper prepaid postage, and notes that the majority of the Certificate of Mailing is redacted.

Between Earl's departure from Jewel and when he first applied for Medicaid in January 2021, he did not have health insurance.  He "waited so long to apply" because "[a]t the time I was pretty healthy, but as time go on, you get older, you need a checkup every once in a while."  Dkt. # 175, ¶ 50.  Earl testified that between his departure from Jewel and January 2021, he had no medical needs for which he needed to apply for

Medicaid or any other insurance. Earl would not have been able to afford the more than $1300 monthly premium for his Blue Choice Insurance, which included his son.

In his Second Amended Complaint, Earl claims: (1) race discrimination prohibited by Title VII, 42 U.S.C. § 2000e-2 (Count I); (2) race discrimination prohibited by the Civil Rights Act, 42 U.S.C. § 1981 (Count II); (3) retaliation prohibited by Section 1981 (Count III); failure to provide notice in violation of COBRA, 29 U.S.C. § 1166 (Count IV); age discrimination prohibited by the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (Count V); retaliation prohibited by Title VII (Count VI); and a breach of the duty of fair representation and breach of the CBA in violation of the Labor Management Relations Act, 29 U.S.C. § 185 *et seq.* (Count VII). Counts III, VI, and VII against Jewel were dismissed. Dkt. # 85, at 10, 13–14. Jewel now moves for summary judgment on the remaining claims for race discrimination (Counts I and II), age discrimination (Count V), and COBRA notification (Count IV).

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is

10

such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704–05 (7th Cir. 2011).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The party opposing the motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court

the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## DISCUSSION

### I.     Motion to Strike and Deem Admitted

As an initial matter, we address Jewel's Motion to Strike and Deem Admitted. Jewel argues that Earl's Statement of Additional Facts must be stricken because it relies "solely on allegations in his Second Amended Complaint or Plaintiff's newly provided declaration that is contradictory to his deposition testimony, based on hearsay, speculation and conjecture, and identifies comparators that were never before disclosed in his many complaints, written discovery, or any other depositions in this case." Dkt. # 176, at 1. Jewel further argues that, because Earl "fails to cite any evidence whatsoever to dispute the majority of Defendant's well-supported Local Rule 56.1 Statements of Material Fact and his self-serving contradictory declaration cannot create a dispute," Jewel's facts "must be deemed admitted." *Id*. at 2.

To the extent analysis of the parties' respective statements of fact is required, the Court addresses those portions individually below. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1019 (N.D. Ill. 2018) ("Because these objections turn out to be issue-specific, fact-intensive, and sometimes immaterial, the court addresses them infra to the extent they bear on material issues."). The Court therefore denies Jewel's motion as moot.

### II.     Counts I and II: Race Discrimination in Violation of Title VII and Section 1981

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C § 2000e–2(a). Section 1981 prohibits race discrimination in the making and forming of contracts. *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013). The same standards apply to Title VII and Section 1981 claims of race discrimination. *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). To survive Jewel's motion for summary judgment, Earl "must either provide enough evidence to permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action . . . or employ the burden shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 [] (1973)." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411–12 (7th Cir. 2018) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself— or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* In other words, we "ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021).

To establish a *prima facie* case of race discrimination under *McDonnell*, Earl must establish that: (1) he is a member of a protected class; (2) he was meeting his

employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees not in the protected class more favorably. *Khowaja v. Sessions*, 893 F.3d 1010, 1014–15 (7th Cir. 2018). If Earl demonstrates a *prima facie* case, the burden shifts to Jewel to articulate a legitimate, nondiscriminatory reason for the employment action. *Id*. at 1015. If it does so, Earl must show that Jewel's stated reason for the adverse employment decision is pretextual. *Id*.

The parties do not dispute that Earl, as a black man, is a member of a protected class or that his termination constituted an adverse employment action.[2] The parties do vigorously dispute whether Earl was meeting Jewel's legitimate expectations at the time of his termination—*i.e.*, whether he truly did have a second "no call/no show" on June 5, 2017. However, Earl has failed to present evidence from which a reasonable jury could conclude that Jewel treated similarly situated employees not in the protected class more favorably and therefore he cannot make his *prima facie* case. And, even if Earl could establish a *prima facie* case, he has not come forward with evidence that Jewel's termination of Earl was a pretext for the prohibited animus. Earl has not raised a triable issue as to whether he was terminated because of his race, and summary judgment in Jewel's favor on Counts I and II is proper.

---

[2] Earl's surviving race discrimination claims only pertain to his firing, not Jewel's failure to rehire him. Dkt. # 85, at 8.

The evidence regarding racial discrimination is recounted above, but the Court addresses below additional "facts" put forward by Earl in his Statement of Additional Facts.[3]

Earl relies heavily on his own affidavit rather than record evidence to support his allegations of Jewel's discriminatory conduct. Although "self-serving statements in affidavits without factual support in the record carry no weight," *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis omitted), self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014). Such an affidavit, however, must meet the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). Personal knowledge can include reasonable inferences,

---

[3] With his Response to Jewel's Motion to Strike, Earl filed a "corrected" response to Jewel's Statement of Facts, which included a revised Statement of Additional Facts. Dkt. # 183-1. Although Earl's original Statement of Additional Facts heavily cited the "Declaration of Billy Earl" (dated February 28, 2022), his "corrected" version cites a revised "Declaration of Billy Earl" dated April 13, 2022. Dkt. # 183-2. Earl submitted the "corrected" version in response to Jewel's arguments that Earl's facts relying on the Second Amended Complaint should be stricken. He claims that his cites to the Second Amended Complaint were "typographical errors" and edited those facts to cite his personal declaration instead. Dkt. # 183, at 1 ("Plaintiff actually meant to refer to Doc. 1, ¶13 for paragraph 18, Doc. 1, ¶14 for paragraph 19, and Doc. 1, ¶16 for paragraph 20 as reflected in the corrected response."); Dkt. # 183-1. Even if this did amount to a typographical error (which the Court doubts), paragraphs 13, 14, and 16 of Earl's April declaration, submitted with his "corrected" response, are different from his original February declaration. *Compare* Dkt. # 169-1 *with* Dkt. # 183-2. Because Earl did not seek leave to file an altered statement of additional facts or a new declaration and because Jewel did not have a chance to respond, the Court finds Earl's submissions procedurally improper. However, in the interest of thoroughness and resolving the case on its merits, and because the changes do not alter the Court's holding, we refer to Earl's "corrected" response and the April declaration. Dkt. # 183-1, Dkt. # 183-2. We still consider Jewel's responses and objections to Earl's original Statement of Additional Facts. Dkt. # 173.

but it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors. *Widmar*, 772 F.3d at 460.

Earl claims in his Statement of Additional Facts that "Anthony Fontanez, who is not African-American and is in his forties, worked with Earl at Jewel and had two no call/no shows. Although he was let go, he got his job back." Dkt. # 183-1, ¶ 14. He further states that "Arnold Mischner, who is not African-American and is in his fifties, worked [with] Earl at Jewel, and had two no call/no shows. Although he was let go, he got his job back." *Id*. ¶ 22. Earl also includes that "Jim Chanin, who is not African-American and is in his fifties, worked [with] Earl at Jewel, and had two no call/no shows. Although he was let go, he got his job back." *Id*. ¶ 15. For these statements, Earl cites his declaration:

> 14. I know Anthony Fontanez. He is not African-American. He is in his forties. I worked with him at Jewel and I know from conversations that I had with him that he had two no call/ no shows. I also know from conversations that I had with him that although he was let go, he got his job back. I also know Arnold Mischner. He is not African-American. I worked with him at Jewel and I know from conversations that I had with my Union Steward Larry Brown that he had two no call/ no shows. I also know from conversations that I had with my Union Steward that although he was let go, he got his job back. It took me a while to secure the information for Anthony Fontanez, Arnold Mischner and Jim Chanin because I did not have their contact information and they would not return my messages that I left with other people that knew them.

> 15. I know Jim Chanin. He is not African-American, he is white. He is in his fifties. I worked with him at Jewel and I know from conversations I had with him that he had two no call/no shows. I also know from conversations that I had with him that although he was let go, he got his job back.

Dkt. # 183-2, ¶¶ 14–15.

Earl's statements regarding the dismissals of Fontanez, Mischner, and Chanin are disregarded because they are neither based on personal knowledge nor sufficiently detailed to raise a genuine issue for trial. *See Buie*, 366 F.3d at 504. Even if we considered these purported facts, they only confirm that Jewel applied the no call/no show attendance policy and terminated employees regardless of race. Furthermore, these statements are not specific enough to show that Jewel treated similarly situated employees not in the protected class more favorably. *See Khowaja*, 893 F.3d at 1015 ("Similarly situated employees must be directly comparable to the plaintiff in all material respects . . . In the usual case, a plaintiff must at least show that the comparators . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (cleaned up). Summary judgment is therefore warranted based on this failure alone.

Earl also claims in his Statement of Additional Facts that:

20.   Sometime around 2016 into 2017, Earl's union representatives warned him that Knedler, Cohen and other Jewel superintendents and managers, including Casey, were determined to force him out of his employment at Jewel. Casey repeatedly asked Jewel managers during meetings when they would get rid of Earl. Casey did not make similar inquiries about non-African American employees.

Dkt. # 183-1, ¶ 20. For this statement Earl again cites his declaration, which says:

16.   Sometime around July 2019, I asked Jewel for my job back. I also asked my Union to help me get my job back. I did so by hand writing letters that I gave to my attorney to mail for me. I learned sometime between 2019 and 2021 that the letters were mailed by certified mail. When Jewel deposed me, I had a memory lapse and could not recall exactly when the letters were written or mailed.

18

Dkt. # 183-2, ¶ 16.

The Court disregards paragraph 20 of Earl's Statement of Additional Facts. Even if it wasn't inadmissible hearsay, this "fact" is completely unrelated to the paragraph of Earl's declaration that he cites and therefore unsupported by any record evidence. *See Eisenstadt*, 113 F.3d at 742.

Finally, Earl claims in his Statement of Additional Facts that:

18. Sometime around 2016 and into 2017, Cohen repeatedly targeted Earl with comments that were intended to demean or harass Earl in the work place. For example, Cohen regularly falsely accused Earl of sleeping on the job, being lazy and not doing any work, and eating while working. Cohen did not direct similar comments to non-African American employees, such as Jose, who was on Earl's team.

19. Cohen knew that his comments would cause Earl distress because they were false, and they embodied negative generalizations and stereotypes about African Americans in the United States culture. Cohen intended his comments to cause Earl distress.

Dkt. # 183-1, ¶¶ 18–19. To support these purported facts, Earl points to his declaration once again, citing paragraph 14 (included *supra*) and the following:

13. In my testimony to the arbitrator on or about July 13, 2018, I testified that "race ain't never been a problem with me." My testimony was not intended to mean that Jewel did not discriminate against me, but only that I had never discriminated against anyone at Jewel during my employment, and that I did not have racial problems with my co-workers other than those in management. If I had been given an opportunity to clarify my testimony, I would have reaffirmed my belief that my employment was terminated in part because of my race, Black.

Dkt. # 183-2, ¶ 13.

As with paragraph 20, paragraphs 18 and 19 of Earl's Statement of Additional Facts are disregarded because these "facts" are completely unrelated to the paragraphs of Earl's declaration that he cites and therefore unsupported by record evidence. *See Eisenstadt*, 113 F.3d at 742.

Finally, Earl's "belief" that he was terminated because of his race cannot rescue his claim. "[O]ur favor toward the nonmoving party on summary judgment 'does not extend to drawing inferences that are supported by only speculation or conjecture.'" *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1108 (7th Cir. 2012) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)); *see also Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) ("As we have noted before, if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (cleaned up). There is simply nothing in the record that would allow a reasonable jury to conclude that Earl was terminated because of his race.

Construing the facts and all reasonable inferences in his favor—as the Court is required to do at this procedural posture—Earl has not presented sufficient evidence creating a genuine issue of material fact for trial concerning his race discrimination claims. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017) (if the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary

judgment must be granted.") (quoting *Celotex*, 477 U.S. at 322). The Court therefore grants Jewel's motion for summary judgment as to Earl's Title VII and Section 1981 claims as alleged in Counts I and II.

### III. Count V: Age Discrimination in Violation of the ADEA

Jewel next moves for summary judgment on Earl's age discrimination claim for Jewel's failure to rehire him. While the same general standards for discrimination claims and summary judgment evidence apply to a failure to hire claim, a *prima facie* case of discrimination in the failure to hire context requires Earl to show that: (1) he was a member of a protected class; (2) he applied for and was qualified for an open position; (3) he was rejected; and (4) the employer filled the position by hiring someone outside of the protected class, or left the position open. *Oliver*, 893 F.3d at 413. The parties do not dispute that Earl was over 40 at all relevant times and that he was not rehired to work for Jewel. However, Earl has not come forward with evidence from which a reasonable jury could conclude that he applied to an open position for which he was qualified or that Jewel filled the position by hiring a non-protected employee (or left the position open).

Earl's claim centers on the letter that he purportedly wrote to Jewel asking for his job back. The parties dispute when that letter was written and/or sent; Earl claims that it was in July of 2019 but Jewel points to Earl's deposition testimony that he believed it was in March of 2020 or later. The parties also dispute whether the letter

was sent at all.  Regardless of whether or when the letter was sent, Earl cannot make out a *prima facie* claim for failure to rehire him because of his age.

The body of Earl's "application" letter is comprised of three sentences: "As you know I was wrongfully [terminated].  I would like to apply for my job back.  Please treat this letter as my application and let me know if you need any additional information."  Dkt. # 158-4, at 42.

Earl submits no evidence regarding whether Jewel had an open position available for which he was qualified when he sent this letter.  The letter itself alludes to no such position other than that he wanted to "apply for [his] job back."  Earl asserts in his response brief that Jewel's argument regarding an open position "is nonsensical and contradicts its own position that Earl would have received his position back if he had agreed to not seek backpay . . . Jewel admits on its brief that the only reason Earl did not get his job back is because he insisted on getting backpay."  Dkt. # 170, at 5 (citing Dkt. # 157, at 11 ("Jewel would have reinstated Plaintiff, as it typically does through the grievance process, without backpay.")).  Even if we credited this argument, Earl provides no evidence as to whether his position, from which he was terminated in 2017 and for which Jewel could potentially have reinstated him after the grievance process that ended in 2018, remained open when he "reapplied" in July of 2019.

There is also no record evidence whatsoever regarding whether Jewel hired someone else instead of Earl for this supposed position, who that person was, and whether such a person was part of the protected class or not.

22

Construing the facts and all reasonable inferences in his favor—as the Court is required to do at this procedural posture—Earl has not presented sufficient evidence creating a genuine issue of material fact for trial concerning his age discrimination claim. *See Blow*, 855 F.3d at 797–98. The Court therefore grants Jewel's motion for summary judgment as to Earl's age discrimination claim alleged in Count V.

## IV. Count III: COBRA Notice Requirement

Finally, Jewel moves for summary judgment on Earl's claim for failure to notify him of his rights to continued healthcare coverage under COBRA after he was terminated.

When a qualifying even occurs, such as termination of employment, an employer is required to notify the plan administrator within thirty days of the date of the qualifying event. 29 U.S.C. § 1166(a)(2). Once the plan administrator is notified, the administrator must notify the employee of his continuation rights within fourteen days. 29 U.S.C. §1166(c). It is undisputed that Earl's termination was a qualifying event. It is also undisputed that Earl did not receive the COBRA Notice.

Courts in this district recognize that a "good faith" attempt to send notice to an employee satisfies an employer's COBRA obligations. *Friedman v. Dynamic Healthcare, Inc*., 2020 WL 610024 at *2 (N.D. Ill. 2020). Jewel contends that the evidence it has submitted establishes the COBRA Notice was sent to Earl in good faith and therefore summary judgment in Jewel's favor is warranted.

It is true that proof of a good faith attempt by Jewel to send the COBRA Notice would be sufficient and that proof of receipt is not required. *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 978 (N.D. Ill. 1998). However, Jewel is incorrect that Earl "improperly" attempts to shift to burden of proof to Jewel (Dkt. # 174, at 12), since "[t]he plan administrator bears the burden of proving that adequate notice of COBRA rights was provided to the former employee." *Keegan*, 992 F. Supp. at 978.

An employer's obligation may be satisfied by sending the required notice by first class mail, including certified mail. *Id.*; *Powell b. Paterno Imps., Ltd.*, 2004 WL 2434225, at *8 (N.D. Ill. 2004). An employer's obligation may also be satisfied with evidence from the plan administrator of adequate standard office procedures for generating and mailing COBRA notices plus evidence showing that the procedures were consistently followed in a given individual's case. *Keegan*, 992 F. Supp. at 979–80.

For example, in *Keegan*, the court held that summary judgment in the defendant's favor was proper when the defendant presented undisputed evidence of its good faith attempt to mail the notice. *Id.* at 980. This included "definite testimony concerning the standard procedures that were followed for generating all notices," the notice letter itself, plus "testimony explaining the routine mailing procedures" and a declaration regarding the generation and mailing of COBRA letters. *Id.*

In *Friedman*, the only case that Jewel cites in support of its argument for dismissing Earl's COBRA claim, summary judgment was granted in the defendant's

24

favor. 2020 WL 610024, at *3. However, there it was undisputed that, with respect to actually mailing the notice, the defendant company's CEO instructed the employee in charge of "caus[ing] COBRA notices to be sent to those who ceased receiving health insurance" to send the COBRA notice to the plaintiff. *Id.* at *1, 3. That employee followed the defendant's "usual and customary procedures when issuing the COBRA notice," the defendant "caused a COBRA notice to be sent to the address" they had for the plaintiff, and the COBRA notice was not returned to sender. *Id.*

In *Powell*, summary judgment was granted for the defendant when it was "undisputed that Plaintiff's COBRA notice was sent via certified mail to Plaintiff's last known address and that Plaintiff was informed several times by the Post Office of this pending mail." 2004 WL 2434225, at *8.

The facts that Jewel puts forward regarding its mailing of the COBRA Notice are the COBRA Notice itself, which is addressed to Earl at his Chicago address and dated September 7, 2017, and the Certificate of Mailing. The Certificate of Mailing appears to be an internal document indicating that a "Qualifying Event Letter" may have been sent to Earl at his Chicago address. But Jewel provided no evidence of sending the COBRA Notice by first class or certified mail, no evidence regarding Jewel's standard procedures for generating or mailing COBRA notices, and no evidence regarding whether such procedures may have been followed here. Drawing all inferences in Earl's favor as the Court is required to do here, Jewel has not met its burden to prove that it made a good faith attempt to notify Earl of his COBRA rights.

*See Keegan*, 992 F. Supp. at 977 ("the issue is not whether the former employee actually received notice; the issue is whether the plan administrator caused the notice to be sent in a good faith manner reasonably calculated to reach the former employee") (cleaned up).

The only other argument Jewel puts forward is that even if Earl had received the COBRA Notice, he did not need and/or could not have afforded COBRA coverage and therefore Earl's claim is moot. Jewel points to no case law in support of its argument that the Court should find an exception to Jewel's notification obligation.

Summary judgment is therefore denied as to Earl's COBRA claim.

## **CONCLUSION**

For the foregoing reasons, the Court grants-in-part and denies-in-part Jewel's Motion for Summary Judgment. The Court denies as moot Jewel's Motion to Strike and Deem Admitted.

It is so ordered.


Dated: 10/5/2022

Charles P. Kocoras
United States District Judge